**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| VALIAN MOUTON, ET AL. | CIVIL ACTION NO. 25-0143 |
| VERSUS | JUDGE ALEXANDER C. VAN HOOK |
| EQUIPMENTSHARE.COM, INC. | MAGISTRATE JUDGE LEBLANC |

## MEMORANDUM RULING

Pending before the Court is a Motion for Summary Judgment filed by Defendant EquipmentShare.com Inc. ("Defendant"). Record Document 21. For the reasons assigned herein, Defendant's Motion is **GRANTED**.

## FACTUAL BACKGROUND

Valian Mouton, et al. (collectively "Plaintiffs") own a parcel of land in Cameron Parish, Louisiana that was leased to a company for helicopter operations for over 30 years. Record Document 1-2 at ¶6. On or around November 2019, Defendant approached Plaintiffs about leasing the land to operate a construction equipment rental service. *Id*. at ¶7; Record Document 21-1 at 6. At a meeting on November 21, 2019, with representatives from both sides present at a local restaurant, Defendant presented a letter of intent ("LOI") to Plaintiffs outlining the proposed terms of the lease. Record Document 21-1 at 6.[1] The proposal included an offer to lease approximately 12 acres of land, including a commercial building located thereon, for

[1] Defendant used a form letter of intent to purchase and modified the form to reflect a lease, rather than a purchase. The parties do not assert that Defendant proposed to purchase the property and the form of the LOI is not relevant to the issues herein.

$1,250 per month per acre, for a total of $15,000 per month. Record Documents 1-2 at ¶8; 21-1 at 6. The parties continued to negotiate the business terms of the lease in early December, and on December 23, 2019, Defendant forwarded an initial written lease draft to Plaintiffs for review. *Id.* at ¶9; *id.* at 7. The parties targeted executing the written lease on December 30, 2019, to be effective as of January 1, 2020. *Id.* Although Plaintiffs had been discussing the idea of terminating the lease with their existing long-term tenant earlier in 2019 if a suitable replacement tenant were found, as of December 23, 2019, that lease remained in place. *Id.* at ¶10; *id.* at 5-6.

The parties continued to exchange correspondence regarding lease details, banking information and execution procedures on December 30, 2019, apparently in an attempt to get the lease finalized so Defendant could take possession on January 1, 2020. *Id.* at ¶11, *id.* at 7. Defendant's property manager told Plaintiffs' representative that he would have the written lease executed by Defendant's authorized signatory "within the next 20 minutes," and the property manager wired $25,000 to Plaintiffs' bank, consisting of $12,500 as the first month's rent and an additional $12,500 as a one-month security deposit. *Id.* at ¶11; *id.* at 8. Upon receiving the $25,000 payment, Plaintiffs executed a lease termination agreement for the existing lease with its long-term tenant, effective as of December 30, 2019. Record Documents 21-1 at 6; 24-4 at 22.

Concurrently on December 30, 2019, Plaintiffs' counsel requested additional changes to the lease terms, *viz*, language requiring Defendant to obtain property insurance on the commercial building, and providing that each party would pay their

own attorneys' fees incurred in negotiating and finalizing the lease. Record Document 21-1 at 7-8. At least in part as a result of the requested changes, the written lease was not fully executed in December 2019. *Id.* at 8.

On January 4, 2020, Plaintiffs' representative emailed Defendant's representative stating that Plaintiffs were waiting on their counsel to give the approval for Plaintiffs to execute the written lease incorporating the revised lease terms. *Id.* On January 6, 2020, Defendant sent an additional $5,000 to Plaintiffs' bank, bringing the total amount provided by Defendant to $30,000. *Id.*; Record Document 1-2 at ¶11. Defendant's representative also forwarded to Plaintiffs a "new vendor form" that was standard for Defendant to have completed to facilitate payments to outside third parties. Record Document 24 at 8. Also in January, the parties further amended the lease terms to exclude the commercial building and the acre of land upon which it stood, thereby relieving Defendant from having to obtain property insurance for the building, changing the number of acres leased, and changing the monthly rent payable under the lease. *Id.* at 9; Record Document 1-2 at ¶14.

Correspondence continued between the parties and on February 27, 2020, Defendant notified Plaintiffs that Defendant proposed to add a lease buy-out option to the agreement (Record Document 24 at 9), and on March 6, 2020, Plaintiffs' counsel wrote Defendant to confirm that Plaintiffs were agreeable to that change. *Id.*; Record Document 1-2 at ¶15. Finally, on March 30, 2020, Defendant notified Plaintiffs that

due to changes in their business prospects Defendant no longer desired to execute a lease with Plaintiffs. Record Document 21-1 at 9. This litigation followed.

## LAW AND ANALYSIS

### A. Summary Judgment Standard.

The law pertaining to summary judgment is well-settled. Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 728 (5th Cir. 2010). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.* "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56(c)). The moving party need not support its motion with affidavits or other evidence, but to defeat a motion for summary judgment the non-movant must present evidence sufficient to establish the existence of each element of its claim as to which it will have the burden of proof at trial. *Id.* at

322. As the Court's jurisdiction lies in diversity, the Court applies Louisiana law. *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938) (holding that a federal court sitting in diversity jurisdiction applies the substantive law of the forum state).

**B. Analysis.**

Plaintiffs allege the parties reached an enforceable oral agreement in December 2019, and they only terminated their lease with the existing tenant because of that oral agreement. Plaintiffs further allege that the parties reached a new and revised enforceable oral agreement on March 6, 2020. Record Document 1-2 at 5. Defendant contends that the parties always intended to execute a written agreement, and since no written agreement was ever executed there was no enforceable lease created. Record Document 21 at 11-14. Plaintiffs sue for breach of contract and for damages from detrimental reliance upon Defendant's promise to lease the property, resulting in them terminating the existing lease with their long-term tenant. Defendant counterclaims for unjust enrichment and seeks the return of its $30,000 payment.

**1. Breach of Contract.**

The Louisiana Civil Code addresses the nature and requirements of a contract to lease immovable property and guides this analysis. Louisiana Civil Code Article 2668 states:

> Lease is a synallagmatic contract by which one party, the lessor, binds himself to give the other party, the lessee, the use and enjoyment of a thing for a term in exchange for a rent that the lessee binds himself to pay. The consent of the parties as to the

> thing and the rent is essential but not necessarily sufficient to a contract of lease.

Louisiana Civil Code Article 2670 states:

> A contract to enter into a lease at a future time is enforceable by either party if there was agreement as to the thing to be leased and the rent, unless the parties understood that the contract would not be binding until reduced to writing or until its other terms were agreed upon.

Louisiana Civil Code Article 2681 provides: "A lease may be made orally or in writing." Finally, Louisiana Civil Code Article 1947 states: "When, in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form." Those provisions distill to require that, in order to have a valid lease contract, the parties must agree, *at a minimum*, on the thing to be leased and the rent payable during the term of the lease. Further, and with a couple of narrow exceptions, if the parties contemplated a written lease, then the contract must be in writing and fully executed in order to be enforceable.

The first exception is when the parties have reached an oral agreement as to all terms, then subsequently determined to reduce that oral agreement to writing, in which case the original oral agreement is binding even if the subsequent written agreement is never achieved. Those situations are treated differently from situations where the parties have contemplated having a written contract from the very beginning. *See. e.g., Rainey v. Entergy Gulf States, Inc.*, 2009-572, p.20 (La. 3/16/10); 35 So. 3d 215, 228 ("Since the parties in the instant case *intended from the beginning to reduce their negotiations to a written contract,* neither the plaintiff nor the

defendant was bound until the contract was reduced to writing and signed by them....") (emphasis in original).

The second exception is when a written contract is contemplated from the beginning, but the parties significantly perform under the oral agreement prior to executing the written contract. In that case, courts have found the original oral agreement binding. *See, e.g., Russell v. City of New Orleans, Dept. of Prop. Mgmt.*, 98-0927, pp.3-4 (La. App. 4 Cir. 2/24/99); 732 So. 2d 66, 68-69 ("However, if a verbal lease includes all essential elements and the parties act upon it, neither may withdraw on the pretext that the lease was not reduced to writing."); *Briede v. Lewis*, (La. App. 1950); 49 So. 2d 349, 351 ("By taking possession of and using the property as they did, defendants waived their right to have the lease contract reduced to writing.")(quoting Johnson v. Williams, 152 So. 556, 558 (La. Supreme Court 1934)); *City of New Orleans v. Hautot*, 185 So. 2d 24, 26 (La. App. 4 Cir. 1966)("[W]here the parties have entered into a verbal agreement to lease, which agreement includes all of the details and conditions, and have acted upon such agreement, neither party can withdraw therefrom for the reason that the agreement has not been reduced to writing even though such was contemplated."). Importantly, the *Hautot* court goes on to note: "But in order for this rule to apply all the details and conditions must be agreed to and understood by the parties; if the agreement is incomplete and not enforceable in all of its parts, it is not a binding lease and cannot be enforced as such." *Id*.

It is beyond peradventure that no written contract was executed between Plaintiffs and Defendant. Thus, for Plaintiffs to defeat summary judgment on their breach of contract claim, they first must show there is a genuine issue of material fact as to whether the parties agreed on all material terms, details and conditions of the proposed lease. Then, they must show that either (1) a written agreement was not contemplated during the initial lease negotiations and only came to be a requirement after the oral agreement was fully consummated, or (2) the parties performed their lease obligations to an extent sufficient to negate the requirement of a written lease. The Court looks to each in turn.

As noted above, the basic elements of a lease for immovable property are agreement on the thing to be leased and the amount of rent payable therefor. One side must offer proposed terms and the other side accept those terms as proposed. LA. CIV. CODE ANN. art. 1927. An acceptance not in accordance with all of the terms of the offer is not acceptance, partial or otherwise, it is a counteroffer. LA. CIV. CODE ANN. art. 1943. *Accord, Ballard v. XTO Energy, Inc.*, 784 F. Supp. 2d 635, 639 (W.D. La. 2011)(any change to the proffered terms is a counteroffer); *JCD Mktg. Co. v. Bass Hotels & Resorts, Inc.*, 2001-1096, p.8 (La. App. 4 Cir. 3/6/02); 812 So. 2d 834, 839-40 (same). Here, the parties initially negotiated for the lease of approximately 12 acres of land, including a commercial building, at a monthly rent of $15,000. Defendant initially agreed to those terms and Defendant's property manager proceeded to wire the first month's rent and the security deposit to Plaintiffs, while telling Plaintiffs he was getting the written lease executed. But Plaintiffs' counsel then requested a

change to those terms, requiring Defendant to investigate acquiring property insurance and for each side to pay its own legal fees and costs. Following that inquiry, the parties agreed instead to change the thing to be leased and the rent to be paid, by reducing the acreage, eliminating the commercial building, and reducing the monthly rent. Thus, there was no meeting of the minds in December 2019 about the basic elements of the lease. Plaintiffs' counsel counteroffered and the parties continued to negotiate. Even after the parties agreed on the new thing to be leased and the new rent to be paid, Defendant counteroffered with new buyout terms, to which Plaintiffs subsequently agreed. The earliest that the parties could be deemed to have agreed on all lease terms was March 6, 2020. There was no agreement, oral or written, in December 2019.

Assuming, without deciding, that the parties actually reached agreement on all of the lease terms in March 2020, the question then becomes whether that oral agreement was enforceable or a written lease needed to be executed. The LOI originally presented to Plaintiffs in November 2019 clearly stated "Unless and until formal closing documents are executed … the terms hereof are subject to change, modification, withdrawal, extension, or deletion."[2] The record is replete with references by both Plaintiffs and Defendant to getting a written lease finalized, executed and delivered, and on December 9, 2019, prior to Plaintiffs terminating the lease with the existing tenant, Plaintiffs requested that Defendant forward a written

[2] Record Document 21-3 at 30-31. As noted *supra* n.1, the LOI was a form document used for purchases and referenced Buyer, Seller and Purchase rather than Lessee, Lessor and Lease, but did state the "Lease Price," "Deposit" and "Term." *Id.*

lease draft to review. Record Documents 21-1 at 6; 21-3 at 14-15. On December 23, 2019, Defendant forwarded a written draft that expressly stated: "This Lease is not intended to be binding until executed and delivered by all Parties hereto." *Id.* at 7; *id.* at 63. Later, on March 6, 2020, the date Plaintiffs allege a new and revised oral agreement was reached, Plaintiffs' counsel requested a draft written lease for review that contained the revised lease terms. Record Document 21-5 at 31 ("Please send me a copy of the proposed lease for review prior to signing."). Nothing in the record before the Court would indicate that the parties did not contemplate executing a written lease from the beginning. Accordingly, this is not a case where the parties agree to an oral lease and later decide to reduce it to writing, and the issue then becomes whether the second exception applies, *viz*, whether the parties began performance under the oral agreement thereby negating the need for a written agreement for the lease terms to be enforceable.

As both sides acknowledge, Defendant wired the security deposit and the first month's rent to Plaintiffs in December 2019 and supplemented that initial payment in January 2020. At no time did Defendant occupy the property, commence business operations there, make any improvements thereon, or otherwise perform any tasks under the alleged lease beyond sending the security deposit and first month's rent. Moreover, assuming as Plaintiffs do that the alleged lease commenced on January 1, 2020, or alternatively on March 6, 2020, Defendant did not make any additional rent payments during February or March as lease negotiations continued. Nothing in the record before the Court reflects the intent of Defendant to agree to the lease terms as

they stood in December 2019, or to perform under those lease terms. Even if Defendant "acted" on the terms of the December oral agreement by forwarding the security deposit and first month's rent, other terms of the agreement were still in flux and the entirety of the lease agreement was not finalized. *See Hautot*, 165 So. 2d at 26. Merely forwarding the required security deposit and first month's rent, without more, fails to reach the level of performance and commitment required by *Hautot, Russell* and *Briede*, *supra*.[3]

In *ASJ Interests v. Chesapeake La. LP*, 2012 WL 2357313 (W.D. La. 2012), which pertained to mineral leases,[4] defendant Chesapeake agreed to lease mineral rights from the plaintiffs on terms to which the plaintiffs agreed. *Id.* at *2. Plaintiffs and Chesapeake had previously executed mineral leases on identical terms on another parcel of adjacent land. *Id.* The parties verbally agreed to the new leases and Chesapeake forwarded proposed lease documents, including W-9 tax forms, to the plaintiffs' designated representative for execution. *Id*. It also cut signing bonus checks for six of the twelve plaintiffs and forwarded them to the landman representing

[3] Plaintiffs rely heavily on *Russell* for the proposition that acting on lease obligations is sufficient to bind the parties even if the contemplated written lease is not executed. Unlike the facts in this case, the parties in *Russell* had executed written leases for the high school graduation ceremony for several consecutive years, intended to execute the same lease for the year at issue, the school board paid all amounts due under the lease agreement, and it otherwise performed all obligations under the lease. The parties assumed the lease had been executed and it was only later, when a lawsuit arose that implicated the indemnity provision of the lease, that the parties discovered the actual written lease had been mistakenly overlooked and was not executed by the school board. Even then, the *Russell* court found that only the basic terms of the lease were enforceable, *i.e.*, "the object of the lease, the lease price, the date(s) and duration of the lease." *Russell*, 732 So. 2d at 69. All other lease provisions the court deemed "onerous," like the indemnification clause, were not enforceable. *Id.* Here, Defendant has not performed any of the lease obligations other than forwarding a security deposit and first month's rent.

[4] "Mineral leases are construed as leases generally, and, where possible, the codal provisions applicable to ordinary leases are applicable to mineral leases, too." 2012 WL 2357313 at *4.

Chesapeake, for delivery to plaintiffs when the lease documents were executed. *Id*. That same evening, Chesapeake decided not to proceed with drilling on the new parcel and rescinded its mineral lease offer, even though all parties had agreed to the mineral lease terms and execution copies were in plaintiffs' hands, with bonus checks ready for delivery. *Id.* at *3. Plaintiffs sued, claiming the parties had agreed to all terms and plaintiffs were in the process of executing the leases, so Chesapeake was bound by those leases. The court found that no enforceable contracts existed, noting "although the parties initially may have had a meeting of the minds, there was no binding obligation on Chesapeake's part until the closing came to fruition." *Id*. at *6.

The record in this case reflects that Plaintiffs, upon receiving the security deposit and first month's rent, believed the deal was done. But that belief was misplaced, as both sides continued to request changes to the lease terms and to negotiate those changes. In fact, there was no meeting of the minds until, at the earliest, March of 2020, and even then, the agreement was not reduced to writing as always contemplated by the parties. Like Chesapeake, when Defendant notified Plaintiffs that it no longer intended to lease the subject property, it did not violate any enforceable lease agreement. *See also Martin v. Schluntz*, 90-1474, (La. App. 4 Cir. 1991); 589 So. 2d 1208, 1210 ("[W]hen negotiating parties agree that the final contract will be reduced to writing, then that agreement is an integral part of the contract itself, and therefore, until such agreement is reduced to writing there is no contract. Either party may retract or refuse to abide by what had been orally agreed

upon."). Accordingly, there is no genuine issue of material fact as to the non-existence of an enforceable lease and that claim fails.

**2. Detrimental Reliance.**

Louisiana Civil Code Article 1967 provides:

> Cause is the reason why a party obligates himself.
>
> A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

"The doctrine of detrimental reliance is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence. To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance." *Luther v. IOM Co. LLC*, 2013-0353, p.10 (La. 10/15/13); 130 So. 3d 817, 825. A claim for detrimental reliance does not require the existence of a formal and enforceable contract between the parties; indeed, the claim usually applies where contract remedies do not exist. *Suire v. Lafayette City-Parish Consol. Gov't*, 2004-1459, 2004-1460, 2004-1466, p.31 (La. 4/12/05); 907 So. 2d 37, 59 (underlying contract not required).

Here, Plaintiffs claim they satisfy the three required elements because (1) Defendant represented it would lease the property, (2) Plaintiffs were justified in

relying upon that representation, particularly when accompanied by a seemingly good-faith proffer of a security deposit and first month's rent, and (3) Plaintiffs terminated the contract with their existing long-term tenant following Defendant's promise and monetary proffer, resulting in Plaintiffs having no tenant. Record Documents 1-2 at ¶27; 24 at 12-16. Defendant counters that Plaintiffs were looking for many months to replace the existing tenant with one paying a higher rent, and that terminating that tenant's existing lease prior to having a fully executed and enforceable replacement lease with Defendant was not reasonable or justified. Record Document 21-1 at15-17.

From the record it is clear that Plaintiffs were looking for a higher paying tenant for their property, that they were not willing to terminate the existing tenant until they had a better replacement, and that they waited until Defendant paid the security deposit and first month's rent before terminating the existing lease. Record Documents 21-3 at 19; 24-4 at 22-23; 24-17 at 18, 21. It is also clear that Plaintiffs relied upon Defendant's statements in negotiating the lease during November and December of 2019 that Defendant definitely wanted the property, which statements were reinforced by Defendant forwarding the advance payment, with Plaintiffs thereby believing that the deal was done. *Id.* And there is no doubt that Plaintiffs terminated the existing lease on December 30, 2019, to their detriment. *Id.* The sole remaining question before the Court on this claim is whether Plaintiffs' reliance was reasonably justified.

Several Louisiana courts have looked to Louisiana Civil Code Article 1947 in answering that question. As noted above, Article 1947 states that if the parties have contemplated a certain form of contract, it is presumed they do not intend to be bound until the contract is in that form. Those courts found that relying on a verbal promise, when the parties contemplated executing a written contract, was not reasonably justified. *See Delta Staff Leasing, LLC v. South Coast Solar, LLC*, 2015-1273, pp.8-9 (La. App. 4 Cir. 5/11/16); 194 So. 3d 745, 750 ("La. Civ. Code art. 1947 is designed to preclude the jilted party from making a detrimental reliance claim when the negotiation process breaks down.")(internal citations and quotations omitted); *Carter v. Huber & Heard, Inc.*, 95-142, pp.4-5 (La. App. 3 Cir. 5/31/95); 657 So. 2d 409, 412 (quoting the trial court and agreeing that "[t]his issue was still in flux, does not constitute a promise, and action on a tentative understanding intended to be reduced to writing is, under these facts, unreasonable.").

Given the clarity of the Louisiana Civil Code, especially as interpreted by Louisiana courts, this Court must agree that where, as here, the parties intended to execute a written lease agreement, for the Plaintiffs to rely on a verbal promise to lease the designated property, even when such promise is supported with the payment of the security deposit and first month's rent, was not reasonably justified when the parties were still negotiating other lease terms, and it was entirely possible that the negotiations would break down over one or more of those other terms. Simply stated, Plaintiffs should have waited until they had a new, fully executed written

lease in hand before terminating the existing lease agreement. For those reasons Plaintiffs detrimental reliance claim fails.

**3. Unjust Enrichment.**

Defendant counterclaims to recover the security deposit and first month's rent paid to Plaintiffs in December 2019, asserting unjust enrichment. As Louisiana Civil Code Article 2298 states: "A person who has been enriched without cause at the expense of another person is bound to compensate that person." "The five elements required to establish an unjust enrichment claim are: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and resulting impoverishment, (4) an absence of justification or cause for the enrichment and impoverishment, and (5) no other remedy at law is available to plaintiff." *Huntsman Int'l LLC v. Praxair, Inc.*, 2015-0975, p.8 (La. App. 4 Cir. 9/14/16); 201 So. 3d 899, 911 (internal citations and quotations omitted). Where a contract exists between the parties, the contract is the law between the parties and supersedes an unjust enrichment claim, as the remedy lies within the contract. *H&O Investments, LLC v. Parish of Jefferson Through Sheng*, 2025-00086, pp.1-2 (La. 5/20/25); 408 So. 3d 958, 959.

Here, there was no contract between Plaintiffs and Defendant. Defendant enriched Plaintiffs in the amount of $30,000, and Defendant was impoverished in the amount of $30,000, when Defendant forwarded that amount to Plaintiffs as a security deposit and first month's rent under a lease that was never executed. Absent the obligation to actually pay a security deposit and rent under a lease, there is no

justification for Plaintiffs retaining that amount, and absent an enforceable contract Defendant has no other recourse for recouping that amount. Accordingly, Defendant has established its claim, and Plaintiffs are ordered to return such funds to Defendant.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendants' motion for summary judgment, Record Document 21, is **GRANTED**. Plaintiffs' claim for breach of contract and detrimental reliance are **DISMISSED WITH PREJUDICE** and Plaintiffs are **ORDERED** to return $30,000 to Defendant.

**DONE AND SIGNED** at Shreveport, Louisiana, this 17th day of August, 2026.

ALEXANDER C. VAN HOOK
UNITED STATES DISTRICT JUDGE